IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 28, 2012

## IN RE: DACIA S., ET AL.

**Appeal from the Juvenile Court for Hamilton County**
**Nos. 245942, 245943, 245944      Suzanne Bailey, Judge**

**No. E2012-01797-COA-R3-PT-FILED-FEBRUARY 14, 2013**

The State of Tennessee Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of Sheila W.[1] ("Mother") to the minor children Dacia S., Aerial W.[2], and Teagan W.[3]  After a trial, the Trial Court entered its order terminating Mother's parental rights to the Children after finding and holding, *inter alia*, that DCS had proven by clear and convincing evidence that grounds existed to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(2) and § 36-1-113(g)(3) and that the termination was in the Children's best interest.  Mother appeals to this Court.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and JOHN W. MCCLARTY, J., joined.

Jennifer G. Lloyd, Chattanooga, Tennessee, for the appellant, Sheila W.

---

[1]DCS also sought to terminate the parental rights of the Children's biological father Donald S. ("Father").  The Trial Court terminated Father's parental rights to the Children and Father's appeal of the termination of his parental rights was pending before this Court at the time of the release of this Opinion.

[2]Within the record on appeal Aerial is sometimes referred to using Father's surname and sometimes referred to using Mother's surname.  Aerial's birth certificate is not included in the record on appeal.  We refer to Aerial W. with the understanding that we are referring to the child Aerial S. a/k/a Aerial W.

[3]Within the record on appeal Teagan is sometimes referred to using Father's surname and sometimes referred to using Mother's surname.  Teagan's birth certificate is not included in the record on appeal.  We refer to Teagan W. with the understanding that we are referring to the child Teagan S. a/k/a Teagan W.

Robert E. Cooper, Jr., Attorney General and Reporter; and Alexander S. Rieger, Assistant Attorney General for the appellee, State of Tennessee Department of Children's Services.

# OPINION

## Background

The Children were taken into State custody on December 14, 2009. DCS filed the petition seeking to terminate Mother's parental rights to the Children in September of 2011. The case proceeded to trial in June and July of 2012.

DCS caseworker Renita Underwood testified at trial. Ms. Underwood was assigned to this case approximately six months after the Children came into State custody and has remained the caseworker for the Children since that time. Ms. Underwood explained that the Children originally were taken into custody because Mother was not on her medication and Mother and the Children were living in a car. Ms. Underwood testified that Mother was assessed at Moccasin Bend in December of 2009, diagnosed with psychotic disorder, and prescribed Risperdal. DCS set up medication management for Mother with Joe Johnson and provided in-home service to assist with transportation and monitoring.

Permanency plans were created which required Mother to pay child support quarterly, have stable housing, remain on her medication, maintain employment, and attend all meetings with DCS, among other things. Mother was employed at a gas station convenience store across the street from her apartment from November of 2010 until April of 2011.

The Children were returned to Mother for a trial home visit beginning on February 5, 2011. Ms. Underwood testified that the Children were placed for the trial home visit because:

> The mother had completed her perm plan. She had did everything the department had asked her to do. She had a stable home with enough bedrooms; her mother was assisting her with the children with daycare when she went to work; she was on her medication; she had in-home services. So she had did everything the department had asked on her perm plan.

On April 12, 2011, the trial home visit was terminated and the Children were taken back into State custody. Ms. Underwood explained that Mother's sister called DCS

on April 12, 2011 because Mother had assaulted her mother, police had been contacted, and Mother was no longer on her medication. Ms. Underwood described the incident stating:

> So I got out there. The mother was in the kitchen. She was crying. As soon as I walked through the door, Dacia stuck to my leg and Aerial stuck to my other leg, so I couldn't really move. They was walking with me everywhere I went. And Teagan was just running around. And they had [Mother] sitting on the couch by herself.

Ms. Underwood further stated:

> Two weeks before the removal, the mother was very angry, and that was the first time, since I began working with her, have I seen that side of her. And I asked her was everything okay, and she said yes. But she was like very, very angry that date.
>
> And then two weeks later, I got the phone call from the sister, and she had stated that she has not been taking her medication. Actually, [Mother's mother] knew that she was not on her medication but she did not call the department.… [Mother's] mother knew that she was not taking her medication. She stated that she tried several times to get her to start back on her medication but she would not take it.
>
> On the day that the trial home visit was terminated, Mother told Ms.

Underwood that her psychiatrist had told her she did not need the medication anymore. Ms. Underwood further described:

> The mother was not on her medication; she had just assaulted her own mother. We went over to the mother's apartment, the curtains, the - - all her curtains were torn down, all the children's clothes was all over the apartment. It looked like someone just went in the refrigerator and just poured food all through the house.
>
> And just observing that and observing the children's behavior, how the children wouldn't even go to the mother because they were just stuck to me, I had to just literally hold the kids by the hand and they had to come with me, so just my observation, that was not the best place for the children during that time.

Mother was charged with assault on her mother and Father's sister. Ms. Underwood does not know what happened with those charges.

Ms. Underwood took the Children back into State custody. Since then Mother has not visited the Children or had any contact with them. DCS has not prevented Mother from seeing the Children.

Ms. Underwood testified that since the Children were taken back into State custody, Mother has been in and out of jail in different places, has not had housing or employment, and has remained off of her medication. Mother also has not attended parenting classes. Ms. Underwood stated that Mother is not capable of supporting herself or the Children at this time.

The Children are in a foster home, which Ms. Underwood testified is a potential adoptive home. Ms. Underwood testified that the Children are "very bonded to their foster family ...." The foster parents have an adult child who is married and no longer living with them and an 18 year old daughter. These adult children get along well with the Children and Ms. Underwood stated they "call [the Children] their little sister and little brother ...."

Prior to placing the Children in the foster home, DCS asked Mother's mother if she would be willing to take the Children, and she declined. The Children had been in custody for almost three years by the time of trial . Ms. Underwood agreed that the Children were placed in foster care because Mother had instability in her housing and mental health and that at the time of trial Mother still had instability in her housing and mental health. The Children do not have any special educational or medical needs. Ms. Underwood does not see any chance for permanency for the Children with Mother.

Ms. Underwood stated:

> Just the mother has called me two weeks. She left me a voice message and it just said that "These are my children, my children, my children, and call me back." But I don't have caller ID, so I don't have a way to reach her. So she did leave them two voice messages in the last two and a half weeks.

Ms. Underwood testified that during the second of those two voice mail messages Mother said "'This is [Mother], call me.' But she didn't leave a number again." Mother knows how to contact DCS but has not visited Ms. Underwood in Ms. Underwood's office since the Children were removed from her custody. Ms. Underwood testified that in the month prior

to trial Mother sent the Children a box of arts and crafts, but has not sent any money or anything else for the Children.

Ms. Underwood gave a timeline since the removal of the Children after the terminated trial home placement stating:

April of 2012, the mother was admitted to Moccasin Bend because we called Crisis for her that day, so the police escorted her to Joe Johnson, and then from Joe Johnson, she went to Moccasin Bend.

She was released on April the 20th. She was given a shot in her arm at Moccasin Bend. And she was supposed to have went back every three weeks because she was set up through Joe Johnson, every three weeks to get the shot for her medication.

On 4/28, she was at Silverdale for the assault on her mother. I don't know when she was released. Then she went back to jail on May 31st in Pikeville for the assault on the father's sister. That's when I found out that she was pregnant. I don't know when she was released. But I didn't have no contact with the mother until August the 18th when she showed up to court on the petition for her children. She did show up for that.

Then she went back to jail in August for a failure to appear. And I think she was released around October 20th, 2011. After that, I found out she was living at the Community Kitchen. She had contacted me around October 20th to let me know that she was living at the Community Kitchen and she wanted her children to come and live with her. And I did explain to her that we could not place the children we [sic] her at the Community Kitchen.

I know, January 25, 2012, she was back in Moccasin Bend due to she took a taxi cab to the foster home because she was going to get her children and the cab driver pulled over and he realized she didn't have no money to pay him, so the police was called for that incident also.

And then Moccasin Bend ended up putting her in a hotel around February, and after that, she was released. And then she came to court, then Moccasin Bend held her until she had the baby in April. So it's been very hard to keep in contact with [Mother].

Ms. Underwood testified that Mother gave the baby up for adoption.

Ms. Underwood agreed that Mother was capable of parenting when she was compliant with her medication. She stated that medication compliance and housing were Mother's biggest obstacles.

Mother testified at trial and admitted that she received mental health treatment and that medication was prescribed for her. Mother also received counseling. She stated this happened before the Children were taken into State custody. When asked where she was living when the Children were first removed from her custody, Mother stated:

Dunlap. We went out and pay our rent, and we leave whenever we get ready to - - we're traveling right now around the other states. I plan on moving to Florida, attending school in Florida. I have a letter from them. We're going to say [sic] in Georgia, Tennessee, staying all over.

Mother denied living in a car when the Children were first removed from her custody. She stated that she was staying with her uncle Jason Brady whom she stated was 34 years old.

Mother testified that after the trial home placement was terminated, she was treated at Mark Savant and then released to go to jail in Sequatchie County. After her release from jail Mother stayed with Father's brother for a couple of weeks. She then went to Chattanooga to stay at the Mission. Mother testified that she has been there on and off for two years.

Mother testified that she has seizures. She stated: "I just started since the kids come back home. I had a seizure in front of them, and I didn't want them to get caught up with that." Mother also testified that she recently was diagnosed with schizophrenia. Mother stated she was being treated for her mental health issues at Silverdale by "the psych doctor there." Mother testified that at the time of trial she was taking the medications Cogentin and Haldol.

Mother was asked about her job at a convenience store, and she testified she worked there for about seven months. When asked why she left that job, Mother stated:

I was scared to death. I actually used the restroom on myself while I was at work because I was so scared. I don't have somebody to look after me, and everybody was and thought I had been on drugs, so did the father, and he owed me money for child support. He was out spending money on more drugs.

People get messed up sometimes. He approached me. When I first met him, I was at the store, my first pay check. He approached me from behind.

-6-

So we had a few kids. And I separated. When I got pregnant, after conception of my third kid, we separated, and finally he got took to jail.

Mother was asked what she was scared of at work and she stated: "I was scared always. I was scared in my own home…. I was scared of guns and violence." Mother was asked if there was something about her job that scared her, and she stated: "It was right across the street from my own home. I didn't feel safe in my own home, either." Mother then was asked if an incident happened at work, and she stated: "The neighbor molested my mother, and she's sort of understanding things right now. She was born with scoliosis, and I'm just looking at my kids like they're safe and issues of health along the way."

Mother stopped working at the convenience store in March or April of 2011 and has not had a regular job since then. Mother testified that she does "side jobs to get by." Mother was asked if she had any means of paying child support, and she stated:

Yes. Judge Owens told me to hang out with my family right now, my sister and my mother, my immediate family. So I did that and my sister and I has problems, too. She's been to Valley. She run off with my W-2, that was taking my taxes for child support. And if it got filed, then I wouldn't have been in jail.

I was hanging out with them. She overdosed on meth and she died, and I was the one that had to wake her up. So I try to stay away from them, but the judge said no, not yet.

Mother testified that at the time of trial she was incarcerated "[o]ver child support," and had six months more to serve. When asked how much she owed in child support, Mother stated: "I'm guessing about $5,000."

Mother was asked about what happened on the day the trial home placement was terminated, and she stated:

Well, I went over to my mom's house and she - - my sister was there, and my sister wanted to play with the kids. And I don't let her play with the kids, because when I was a little girl, my mom found me undressed under the covers with her. And she said if it happened again, she would tell my dad.

Next thing I knew, my dad was dead. And I was with my sister all alone because of my mom can't handle stuff like that. She's too sick. I don't know why my father is dead, but she's not going to kill my mother…. She

called the law, my mom did, and said I choked her. I wouldn't lay hands on my mother, unless she was sick, and I tried to help her.

When asked if she thought that in February of 2011 she was able to parent the Children, Mother stated:

Most definitely not, but I loved my children and wanted to see them.… Because I was on the wrong type of medicines, they couldn't find something that works for me. I am 99 percent diabetic. And if I stay in places like jail or stay in places where someone else is taking care of me, it worsens my symptoms. And I know how it feels to ride around in a wheelchair or watch people, at least, so I try to do everything so I don't worsen my health.

Mother was asked if someone told her she was on the wrong medication and she stated:

Yes. I had a lawyer, he paid for a room for me for a month. And they brought me my mail, they checked my mail for me. And I had people doing things for me, and they brought it to me, and it wasn't my lawyer. The first thing I heard from him. And I didn't even get to open it. Rushed me to the hospital, said I was going to the hospital right now.

Mother was asked what she thought the biggest obstacle was to her working a permanency plan and she stated:

Right now, if I have any plan to go by, it's going to have to be strictly everybody has to be doing their job; they can't leave me laying somewhere for three weeks and not come back and check on me when they're told, because my mind - - I had a car wreck, and the doctor told me I would never be the same, forget things with me.

Like after three weeks, you come back to my door, I think you're a stranger. I don't live in the nicest places in town. I live in a safe place to me, where I can keep my kids safe.

Mother was asked if she would be able to parent now, and she replied: "Most definitely not.… I'm on the verge of having a seizure." When asked if she thought she would be able to parent in the future, Mother stated:

Yes, ma'am. My Doctor, when the kids got took out of the home, they said I needed a mental evaluation. So I went to it. The guy said I was in fair

condition, I did not need any medicine, I did not need anything, but maybe counseling on my own.

So I went home to my mother. All he gave me was a business card, and I gave it to my mother. She said, No, you need some medication. I'm calling the caseworker. She called the caseworker, and they come and picked the kids up.

Mother testified that the foster mother would not allow her even to call the Children. Mother stated: "she threatens me with jail issues." When asked how many times she had tried to call the Children, Mother stated: "Numeral, more than a hundred." When asked if she had tried to see the Children, Mother stated: "She will not allow that. I've not got in a car and went to her house because she threatens to call the law and stuff on me." Mother testified that she has contacted DCS numerous times.

Mother was asked if she knew any reason why the foster parents should not adopt the Children, and she stated:

Well, she already had them put to sleep. They believe in aesthetics (sic) and used overstrength and had them put to sleep. Took them for a general checkup. It was a party for them they had in Georgia, and that's why we left.

They passed. She said she got so excited because she passed the denial [sic] checkup at the Erlanger. They had cavities, but she passed. And she didn't pass her hearing test right then, but she said she would give her one in school, too. If anything, it was her ears, not her teeth bothering her. They went right in to put her to sleep. And hopefully the doctors at Erlanger will check her ears.

Mother agreed that she had concerns with the medical treatment the Children were receiving and stated: "I took her to Dr. Lazer. He said his wife had a problem with overreacting to pain. I don't know why a doctor would tell me his personal problems, but that's where their doctor is now, his wife."

When asked if she thought the Children were loved and taken care of in the foster home, Mother stated:

Takes a lot of love to see your children being loved and being not loved, riding without car seats, falling out of the van on their head. After you fall three

times, you are picked up, and you're going to quit being clumsy, as long as you're being watched.

She's fat, she's overweight, and she has a problem with obesity, and she's ashamed of it.

Mother stated: "I have a home for my kids. We've been home about 30 minutes, all of us. They know where our home is, when we get there. We stay on the road traveling. Dad said we are always welcome at home." Mother acknowledged she was speaking of a residence off of East Valley Road in Sequatchie County and then stated: "I don't go home very often. I've been robbed very often staying there on the street."

Mother admitted that she has not seen the Children since the trial home visit was terminated. Mother has been in three different jails in Sequatchie County and Bledsoe County since 2011. Mother stated that she had spent three months in jail since April of 2011. About being in jail, Mother testified:

I got in the wrong crowd across the street. That's where I end up, worked in a Krystal Restaurant, and the family had a problem with that, and they're coming every day with the questions. I don't know why they have a problem. That's the backsliding, because they're the Catholic way home.

Mother testified that while not in jail she stayed in her house which her father owned. Mother stated: "I go visit and get everything I need. All I would need was a fresh plate of food, and he sends me on my way." Mother was asked where she goes when her father sends her on her way, and she stated: "Back to see him. I take a long tour and go back and meet up with him…. Where you find a place to calm down at and make it safe…. I was awarded a motel. I was staying out in the woods." Mother admitted that she was staying in the woods in a tent. Mother also admitted that she does not talk to her father very often, but insisted that he had told her she could "come home whenever I wanted."

Mother testified that since April of 2011 she has worked cleaning houses and further stated: "I did that for about three months, and three months of cleaning houses got me where I was today. I didn't get picked up for a warrant. Like I said, I was scared to death, and he took me to jail. So I got a place to stay." Mother was asked if she thought jail was a good place to stay and she stated: "No. Jail is not my idea of the place to stay, when you left methadon clinics, clinical societens (sic), leave the jail after they've been charged with manufacturing meth, then, yeah, I will stay there and do some time." Mother was asked who she was staying with that got charged with making meth, and she stated: "I was not staying with anyone. But you do get rides with them to take my children places, the state does. I sit

back and watch. That's why I'm so sick." Mother then was asked if it was the State's fault that she has mental problems and she stated: "Yes, my mom's condition, can't take care of three kids driving downtown. She walked out and she fell apart."

Mother was asked about having a job and she insisted that she had the ability to support herself. When asked how she would support herself, Mother stated: "I take a bath." Mother was asked how she earns money to feed herself, and she replied: "Through taxes." Mother was asked if that was how she would continue to support herself when she got out of jail, and she stated: "If I'm stole from, yes."

Mother was asked if the Children should be returned to her immediately and she stated: "No, sir, I cannot take care of them at this point. I feel another seizure coming on. If they're immune to that, they'll get the same symptoms I have and have a seizure, too, and have to fight it." Mother was asked if she was mentally unable to function without her medication, and she stated: "That's wrong. The doctor told me it was best for me not to be on meds." When asked if she would take her medication if the Children were returned to her, Mother stated: "If a doctor told me to, yes, I would take medication."

When asked if she did drugs with Father, Mother stated: "I thought it was insulin. He smokes it." Mother admitted that she smoked drugs "[h]owever [Father] give it to me. He usually give it to me in a hot tube." Mother was asked if she would go back and live with Father, and she stated:

No. I stayed with him to take care of his sister's kid. He had spina bifida, and he had AIDS set up in his back, so he got nasty. I had to clean it up. I made it to the hospital where he was dying. I saw the judges walk out of the room, so I just let him die.

Mother was asked if her living situation had been stable, and she stated: "Yes, I have been stable since I was seven years old." Mother was asked if she would be in a position to take the Children if she were released from jail that day, and she stated: "Yes.... Yes. And I don't talk to strangers." Mother, however, agreed when asked that she was not medically stable. She was asked what she believed the Children needed, and she stated:

As for my children, is to have a mother that can take care of them. Right now I'm not medically stable, and the doctor would tell you that. I don't know why, but I could just have somebody go to the doctor, tell me if I needed help, to just ask that. And I asked, and no one called help for me.

As to whether she had ever applied for disability, Mother stated: "Yes, I have. I had an appointment on the 19th of June to John McMahon, and I come to jail on the 18th. I had a warrant on me so I was kind of scared, so I decided to go to jail." Mother was asked about her testimony that she stayed at Mission for the last year and a half given that her home was in Sequatchie County, and she stated: "Because I'm planning to go to Chattanooga State. And everytime I get in, I get robbed. I don't even have my own shoes from the jail. I had to borrow shoes."

After trial, the Trial Court entered its Termination of Parental Rights and Final Decree of Complete Guardianship on August 14, 2012 terminating Mother's parental rights to the Children after finding and holding, *inter alia*:

(A) Respondent, [Mother], has failed to comply in a substantial manner with the statement of responsibilities set out in periodic foster care plans prepared for and signed by said Respondent, following the subject children being found to be dependent and neglected by the Juvenile Court of Hamilton County. Children's Services has explained to Respondent [Mother], those reasonable responsibilities, which are directly related and aimed at remedying the conditions, which necessitate foster care placement. Specifically, one of the most important tasks of the Respondent's permanency plan was for her to continue her mental health treatment all [sic] follow all recommendations as well as take all prescribed medications and continue medication management. The mother was also supposed to accept and cooperate with case management services from Joe Johnson Mental Health Center.

Initially, the Respondent was in substantial compliance with her permanency plan and the Department placed the subject children back in her physical custody on a ninety (90) day trial home visit which started on February [5], 2011. The trial home visit had to be terminated on April 12, 2011 due to the fact that the mother stopped taking her medication and became violent again. The Respondent has been hospitalized at Moccasin Bend Mental Health Institute in August 2008 and was diagnosed with Psychotic Disorder. At the time she was hospitalized in August 2008, the mother was found walking on the freeway with her two (2) oldest children and was pregnant with her third child. The mother reported that she thought people at the shelter were poisoning her food and trying to steal her children. At the time of her discharge on August 12, 2008, it was recommended that the mother take Risperdal and that she have follow-up mental health treatment at Joe Johnson Mental Health Center. Her prognosis was guarded.

The mother was hospitalized at Moccasin Bend again on December 11, 2009 and was admitted from Joe Johnson. She was referred at that time for bizarre behavior and the nurse practitioner noted that the mother was under the belief that she had no mental health issues.

Currently, the Respondent is not in compliance with her plan and has not visited with the subject children since her trial home visit was terminated on April 12, 2011.

(B) [The Children] have been removed by order of a court for a period of six (6) months. The conditions which led to the removal still persist or other conditions persist which in all probability would cause [the Children] to be subjected to further abuse and neglect and which, therefore, prevent the children's return to the care of Respondent. There is little likelihood that these conditions will be remedied at an early date so that the children can be returned to Respondent in the near future. At the time of their removal in December 2009, the mother's mental illness was negatively affecting her ability to parent. The mother was living with the children in a car at the time of the referral and the Department of Children's Services and Soddy Daisy Police Department worked together to furnish the family with a motel room. The mother also failed to comply with preventative services and the children had to be removed. At one point in the case, the mother was doing really well and was in substantial compliance with her permanency plan and the children were placed on a trial home visit with her on February 5, 2011. Shortly thereafter, the mother started to deteriorate again. She lost her job; got evicted from her housing; ceased taking her prescribed medications; and was arrested and incarcerated for assaulting family members. The children were removed from the trial home visit and placed back into their foster home on April 12, 2011. Since that time, the mother has not visited with the children or paid any child support and is currently homeless and unemployed. These issues, along with her failure to maintain her mental health treatment make the mother unable to provide the subject children with a safe and suitable living environment.

4. Pursuant to T.C.A. § 36-1-113(i), it is for the best interest of the subject child and the public that all of the parental rights of Respondent, [Mother], to [the Children] be forever terminated and that the custody, control and complete guardianship of said child should now be awarded to the State of Tennessee, Department of Children's Services with the right to place said child for adoption and to consent to any adoption *in loco parentis,* in that

(a) Respondent, [Mother], failed to make any adjustment of circumstance, conduct or conditions to make it safe and in the children's best interest to be placed in the care of

-13-

said Respondent. The mother did make significant progress for a while, but during her trial home placement in 2011, stopped taking her medication to treat her mental illness and began a rapid decline. Since the trial home visit with the children ended in April 2011, the mother has had no contact with the children or Department and her current living conditions are unsafe.

      (b)  Respondent, [Mother], failed to effect a lasting adjustment of her circumstances after the state has made reasonable efforts to help her for such duration of time that lasting adjustment does not reasonably appear possible. The Department has offered the mother a large variety of services to help her be able to safely parent and the mother has repeatedly shown that she is unable to hold it together for any significant period of time.

      (c) Respondent, [Mother], has not maintained regular visitation or other contact with the children.

      (d) A change of caretakers and home is likely to have a highly negative effect on the children. The children are currently placed in an adoptive home and have been placed there since December 11, 2009. The children were removed from the foster home when they were placed back in their mother's physical custody from February [5], 2011 until April 12, 2011. The children were returned to the foster home on April 12, 2011 and have been there ever since.

      (e) Respondent [Mother], or someone living with them, has shown brutality, abuse or neglect toward the children. Due to the mother's failure to take her prescribed medications at the time of removal, the children were living with her in a car in the winter.

      (f)  Respondent [Mother's] present mental or emotional status would be detrimental to the children or prevent the Respondent from effectively providing safe and stable care and supervision for the child. The Respondent functions well when she is on her medication, but since April 2011, she has not been taking her medication or receiving mental health treatment and she is currently homeless and jobless.

Mother appeals to this Court the termination of her parental rights to the Children.

### Discussion

      Although not stated exactly as such, Mother raises one issue on appeal: whether the Trial Court erred in finding and holding that DCS made reasonable efforts to assist Mother while the Children were in State custody.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

> Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence

supporting any single ground will justify a termination order.  *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

The Trial Court terminated Mother's parental rights to the Children on the grounds of substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2) and persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3).  As this Court explained in *In re: R.L.F.*:

> Termination on the ground of substantial noncompliance with the permanency plan implicates the Department's obligation to demonstrate that it made reasonable efforts to reunite a child with his parent.  Tenn. Code Ann. § 37-1-166(b).  Where the Department seeks to terminate parental rights on a ground that implicates the Department[']s obligation to use reasonable efforts to make it "possible for the child to return safely to the child's home," Tenn. Code Ann. §§ 37-1-166(a)(2), - 166(g)(2), those reasonable efforts must be proved by clear and convincing evidence.  *In re: B.B.*, No. M2003-01234-COA-R3-PT, 2004 WL 1283983, at *9 (Tenn. Ct. App. June 9, 2004) (citing *In re: C.M.M.*, 2004 WL 438326, at *7-8).  Thus, the Department had the burden to prove by clear and convincing evidence that it exercised reasonable care and diligence to provide services reasonably necessary to meet Mother's needs to assist her to fulfill her obligations under the permanency plans.  *In re: Valentine*, 79 S.W.3d at 546; *In re: C.M.M.*, 2004 WL 438326 at *8; Tenn. Code Ann. § 36-1-113(c).  This burden required that the Department present sufficient evidence to enable us to conclude, without serious or substantial doubt, that the efforts were reasonable under the circumstances.  *In re: Valentine*, 79 S.W.3d at 546; *In re: C.D.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000); *see Walton v. Young*, 950 S.W.2d 956, 960 (Tenn. 1997).

> The goals and requirements set forth in permanency plans may not be arbitrary or unreasonable.  To the contrary, they must be directed toward remedying the conditions that led to the child's removal from the parent's custody.  *In re Valentine*, 79 S.W.3d at 547; *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004); *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003).

> "The success of a parent's remedial efforts generally depends on the Department's assistance and support."  *In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006).  Accordingly, the Department's employees have an affirmative duty to utilize their education and training to assist parents in a reasonable way to address the conditions that led to the child's removal and to complete the tasks stated in the plan.  *In re Giorgianna H.*, 205 S.W.3d. at 519; *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *14 (Tenn. Ct. App. June 30, 2005); *In re C.M.M.*, 2004 WL 438326, at *7; *In re D.D.V.*, No. M2001-02282-COA-R3-JV, 2002 WL 225891, at *8 (Tenn. Ct.

App. Feb.14, 2002). This duty exists even if the parent does not ask for assistance. *In re C.M.M.*, 2004 WL 438326, at *7. The importance of the Department's role in this regard has been emphasized by this court on numerous occasions. *In re B.L.C.*, No. M2007-01011-COA-R3-PT, 2007 WL 4322068, at *8 (Tenn. Ct. App. Dec. 6, 2007) (no Tenn. R. App. P. 11 application filed); *In re C.M.M.*, 2004 WL 438326, at *7 (stating that "[i]n many circumstances, the success of a parent's remedial efforts is intertwined with the efforts of the Department's staff to provide assistance and support"); *In re J.A.W.*, No. M2007-00756-COA-R3-PT, 2007 WL 3332853, at *4 (Tenn. Ct. App. Nov. 8, 2007); *In re Randall B., Jr.*, No. M2006-00055-COA-R3-PT, 2006 WL 2792158, at *5-6 (Tenn. Ct. App. Sept. 28, 2006).

Reasonable efforts are statutorily defined as the "exercise of reasonable care and diligence by the department to provide *services related to meeting the needs of the child and the family*." Tenn. Code Ann. § 37-1-166(g)(1) (emphasis added). The factors the courts are to use to determine reasonableness include: (1) the reasons for separating the parents from their children, (2) *the parents' physical and mental abilities*, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children[']s removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department[']s efforts. *In re Tiffany B.*, 228 S.W.3d 148, 158-59 (Tenn. Ct. App. 2007) (footnote omitted) (emphasis added) (citing *In re Giorgianna H.*, 205 S.W.3d at 519).

*In re: R.L.F.*, 278 S.W.3d 305, 315-17 (Tenn. Ct. App. 2008).

Additionally, as this Court stated in *State of Tennessee, Department of Children's Services v. S.M.D.*:

The State "must make reasonable efforts to preserve a family before seeking to terminate parental rights." *In re: Jeremy D. and Nathan D.*, No. 01-A-01-9510-JV-00479, 1996 Tenn. App. LEXIS 292, at **7-8, 1996 WL 257495, at *3 (Tenn. Ct. App. May 17, 1996), *no appl. perm. appeal filed*. However, "[r]eunification of a family is a two-way street, and the law does not require DCS to carry the entire burden of this goal." *In re: R.C.V. and O.V.*, No. W2001-02102-COA-R3-JV, 2002 Tenn. App. LEXIS 811, at *39, 2002 WL 31730899, at *11 (Tenn. Ct. App. Nov. 18, 2002), *no. appl. perm. appeal filed*.

*State of Tennessee, Department of Children's Services v. S.M.D.*, 200 S.W.3d 184, 197-98 (Tenn. Ct. App. 2006).

In her brief on appeal, Mother argues, in large part, that DCS failed to assist her after the terminated trial home placement, in part, by failing to contact Mother while Mother was hospitalized at Moccasin Bend and "incarcerated at various institutions." The record shows that Mother was admitted to Mocassin Bend when the trial home placement was terminated because DCS made the phone call to set it up and also shows Mother was receiving mental health assistance at Mocassin Bend. DCS also set Mother up for medication management through Joe Johnson. It is unclear what DCS could have done to assist Mother during Mother's repeated incarcerations. Furthermore, the record shows that DCS had difficulty keeping in contact with Mother because Mother did not keep DCS apprised of her whereabouts or how to reach her and because Mother was in and out of jail in more than one county. Mother left some voice mail messages for the caseworker, but never left a number where she could be contacted.

The record on appeal shows that the Children were taken into State custody because Mother was not taking her medication and Mother and the Children were living in a car. DCS was aware of Mother's mental needs and took steps to assist Mother in getting evaluated and appropriately medicated. The record shows that Mother had some family members who also were assisting her, specifically her mother who was assisting Mother with childcare during the trial home placement. The record also shows that with DCS's assistance, Mother made an attempt to work the permanency plans and was successful for a time. This success led to DCS placing the Children with Mother in the trial home placement. Unfortunately, the record also shows that the duration of Mother's success was short-lived. The trial home placement was disrupted and terminated because Mother stopped taking her medication and assaulted family members. The record shows that the requirements of the permanency plans were targeted toward remedying the conditions which led to the Children being taken into State custody. The record shows that Mother was able to parent the Children with some assistance when she was taking her medications.

Unfortunately, Mother chose to stop taking her medication, which rendered her unable to parent the Children. "Reunification of a family is a two-way street …" and while Mother carried her burden for a short time, Mother has remained off of her medication and has been in and out of jail multiple times since the trial home placement was terminated. *In re: R.C.V. and O.V.*, No. W2001-02102-COA-R3-JV, 2002 Tenn. App. LEXIS 811, at *39, 2002 WL 31730899, at *11 (Tenn. Ct. App. Nov. 18, 2002), *no. appl. perm. appeal filed*. Mother herself admitted that at the time of trial she was unable to parent the Children, and the record shows that since the trial home placement was terminated Mother has made no attempt toward correcting the conditions which led to the Children being taken back into State custody. Mother has taken no steps to obtain stable employment or housing and instead has engaged in actions which have led to Mother being incarcerated in multiple jails. Most importantly, Mother continues to choose to remain off of her medication.

The Trial Court found that grounds for terminating Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(2) and § 36-1-113(g)(3) had been proven by clear and convincing evidence. The evidence in the record on appeal does not preponderate against these findings made by the Trial Court by clear and convincing evidence. The Trial Court also found that clear and convincing

evidence had been proven that it was in the Children's best interest for Mother's parental rights to be terminated. The evidence in the record on appeal does not preponderate against these findings made by the Trial Court by clear and convincing evidence. The Trial Court further found that DCS made reasonable efforts to help Mother make lasting adjustments to her circumstances and conduct. Given the evidence before us, we have no "serious or substantial doubt, that [DCS's] efforts were reasonable under the circumstances." *In re: R.L.F.,* 278 S.W.3d at 316. In light of all the evidence in the record before us, the evidence does not preponderate against these findings made by the Trial Court by clear and convincing evidence. We, therefore, affirm the termination of Mother's parental rights to the Children.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Sheila W.

_____
D. MICHAEL SWINEY, JUDGE